Keating, J.
At 1:30 p.m. on September 11, 1964, a Friday, Anthony Williams was fatally wounded-by a shotgun blast in the chest. Mr. Williams, an employee of the A. R P. Excavating Company, was standing just outside the doorway of the company’s field office trailer when the fatal shot was fired. It was payroll day and, at the time of the shooting, there was a substantial amount of cash in the trailer. The killer never attempted to enter the trailer, however, and fled with another man after apparently discharging the shotgun by mistake.
*445 Defendants Mirenda and Bielawa were observed in their flight by a number of persons, but only two witnesses, a truck driver and his assistant, could testify that these defendants were the men they had seen running to a car as their truck approached the scene of the crime. These two men observed the defendants for only 15 seconds. There is no identification testimony that places either of the defendants at the trailer site. The prosecution’s other identification witnesses were only able to testify to general descriptions of the fleeing men. However, three accomplices testified that Mirenda and Bielawa had planned and committed the crime.
After the two men escaped in a car, a motorist, passing the scene of the crime, noticed a pair of sunglasses lying in the roadway. The motorist stopped his vehicle and picked them up. He observed a congregation of people standing near the construction trailer and brought the glasses over to ask if one of these persons had dropped them. When none of the spectators acknowledged ownership of tlj.e glasses, the driver turned them ■ over to a police officer investigating the crime.
Five persons were arrested by the New Rochelle and New York City Police Departments for the crime. On November 7 and 8, 1964 officers arrested Grigg, Heller, DiBerardino, Mirenda and Bielawa for their participation in the crime. Grigg, Heller and DiBerardino made statements in which they fully acknowledged their involvement. Mirenda and Bielawa denied having any part in the crime.
The Westchester County Grand Jury indicted all five of the suspects. The indictment originally contained four counts. The first three were against Mirenda, Bielawa and DiBerardino only. The indictment charged these three with attempted robbery, premeditated murder and felony murder. The fourth count was against all five, charging a conspiracy to commit robbery.
While the defendants were detained in the Westchester County Jail, Mirenda spoke with Grigg and DiBerardino and made certain admissions concerning the death of Williams. At the time Mirenda made these statements he did not know that Grigg had testified before the Grand Jury.
The District Attorney notified DiBerardino that he expected to use his confession at trial. DiBerardino requested a Huntley hearing but never notified his codefendants of his request. At *446 the hearing DiBerardino was the only defendant present. The Judge at the conclusion of the hearing found the confession was made voluntarily.
Prior to trial the fourth count of the indictment was severed. The trial commenced on September 15, 1965 on the first three counts. Heller and Grrigg both testified on behalf of the prosecution and parts of their testimony disclosed admissions made by defendant Mirenda while all of them were incarcerated. In general, their testimony was extremely damaging to the defendants’ position. On September 29, 1965, after the trial had proceeded before the jury for eight court days, DiBerardino decided to turn State’s evidence. At the request of the District Attorney, DiBerardino’s prosecution was severed from that of Mirenda and Bielawa.
Neither Mirenda nor Bielawa took the witness stand in their own defense. Co-conspirators DiBerardino, Heller and Grrigg all testified that Mirenda and Bielawa were the perpetrators of the crime and that they were only accomplices in planning and stealing the getaway car. DiBerardino also testified that he escorted the defendants to New Rochelle where he left them only two blocks from the scene of the crime shortly before the specified hour. Both defendants were identified fleeing from the scene of the crime. If the two eyewitnesses ’ observations are believed the evidence in the record is sufficient to connect the defendants with the commission of the crime in such a way as may ‘1 reasonably satisfy the jury that the accomplice [s] [are] * * * telling the truth ” (People v. Dixon, 231 N. Y. 111, 116; People v. Morhouse, 21 N Y 2d 66, 74; People v. Fiore, 12 N Y 2d 188, 201-202; People v. Malizia, 4 N Y 2d 22, 27).
The record also amply demonstrates that the perpetrators proceeded far enough in the execution of their plan for an attempted robbery to have taken place. The fortuitous discharge of the shotgun was the only superseding event which prevented the two suspects from completing the robbery. The unexpected discharge caused their plan to be aborted. The abandonment of the criminal intent, however, occurred too late in the stage of preparation for the law to conclude that no attempt occurred (People v. Sullivan, 173 N. Y. 122, 134).
Nevertheless, we have concluded that a number of errors occurred, the cumulative effect of which requires that the judg *447 ment of conviction be reversed. (People v. Carborano, 301 N. Y. 39, 42 [1950]; People v. Mantesta, 27 A D 2d 748; cf. People v. Gould, 25 A D 2d 160.) We realize that in the course of a protracted criminal prosecution it is almost inevitable that certain errors will occur. Our court and the Federal courts have always acknowledged this fact and have held many errors harmless (Code Grim. Pro., § 542; see, e.g., People v. Kingston, 8 N Y 2d 384; Chapman v. California, 386 U. S. 18; Fahy v. Connecticut, 375 U. S. 85). However, we cannot shirk our obligation to uphold the rule of law simply because the record discloses ample evidence of the defendants’ guilt when numerous errors have been committed which in their totality substantially prejudice the defendants’ right to a fair trial. It should be remembered that “ The worst criminal, the most culpable individual, is as much entitled to the benefit of a rule of law as the most blameless member of society. To disregard violation of the rule because there is proof in the record to persuade us of a defendant’s guilt would but lead to erosion of the rule and endanger the rights of even those who are innocent ”. (People v. Donovan, 13 N Y 2d 148, 154 [Fulo, J.]; see People v. Adams, 21 N Y 2d 397, 402; People v. Rosenfeld, 11 N Y 2d 290, 300; People v. Mleczko, 298 N. Y. 153, 162.)
I. NOTICE REQUIREMENTS FOR A HUNTLEY HEARING
A. Notice To Other Codefendants
The defendants claim it was prejudicial error that they were not informed that codefendant DiBerardino was having a Huntley hearing. Section 813-h of the Code of Criminal Procedure requires that, ‘ ‘ If more than one defendant is named in the indictment, information, complaint or charge, the moving party shall serve the notice of motion and all papers upon which it. is made, upon each co-defendant, or upon his counsel if the co-defendant is represented by counsel. The trial shall not be commenced until the motion has been determined. ’ ’ The District Attorney claims that his office committed no error in failing to inform the codefendants of DiBerardino’s Huntley hearing. He points to the language of the statute which requires the moving party, the defendant, to inform all other defendants. The District Attorney is technically correct. However, it would be desirable for courts, before the hearing proceeds, to determine *448 whether other codefendants were notified. In People v. Anderson (16 N Y 2d 282) we determined that a Huntley hearing could not be held without the presence of the aggrieved defendant. In that opinion we indicated that the Huntley hearing was for certain purposes regarded as a stage in the trial. (But see People v. Cefaro, 21 N Y 2d 252.) Though in Anderson the indictment only charged a single defendant, its reasoning is equally applicable to joint trials. This is not to say that other codefendants must be present in order to proceed with the hearing, but only that the Judge should inquire whether the proper notice to these defendants has been given.
Even though it was preferable to have inquired whether other codefendants were notified of DiBerardino’s Huntley hearing, no prejudice arose from the failure in this case because the confession was never introduced. After DiBerardino’s prosecution was severed he testified at the trial.
B. When Does A Defendant Have To Be Informed Of Admissions Or Confessions
A second alleged error stems from the District Attorney’s failure to inform defendant Mirenda that the prosecution intended to introduce admissions Mirenda made to co-conspirator G-rigg while in jail.
Mirenda asserts that section 813-f of the Code of Criminal Procedure requires the District Attorney to notify the defendant if the People intend to offer a confession or admission in evidence. The language of the statute does not distinguish, for the purpose of notice, between confessions and admissions made to the police or private individuals. We do not, however, interpret the legislative intent as requiring the District Attorney to notify defendants of admissions made to private parties who were not police agents. In People v. Huntley (15 N Y 2d 72) we adopted the Massachusetts rule for determining voluntariness of admissions and confessions made to police officers. Our decision was in direct response to the Supreme Court’s decision in Jackson v. Denno (378 U. S. 368) finding the procedure employed in New York to test voluntariness constitutionally infirm, thus overruling their prior decision in Stein v. New York (346 U. S. 156).
When an admission is made to a private person the procedure established by section 813-f is inapplicable. As we said in People v. Ross (21 N Y 2d 258) “ the obvious purpose of the statute is *449 to give a defendant adequate tíme to prepare Ms ease for questioning the voluntariness of a confession or admission” (id., p. 262). The present procedure is ill suited to he a pretrial discovery device. We do not believe the Legislature intended it to be such. Therefore, if no question arises in respect to the voluntariness of an admission made to a private person there is no need to reqMre a hearing.
additionally claims, however, at the time made these admissions, ti-rigg was a police informant. Mirenda and tirigg were incarcerated in the same cell block in Westchester tiounty. If Mirenda’s contention is correct his statements would be inadmissible because he was interrogated after he had been arraigned and represented by counsel (People v. Arthur, 22 N Y 2d 325; People v. Gunner, 15 N Y 2d 226; Massiah v. United States, 377 U. S. 201). Statements made by a cell mate to another deliberately placed by the prosecution in proximity to the defendant in order to get statements would be a violation of a defendant’s rights (People v. Robinson, 13 N Y 2d 296; compare People v. Gunner, 15 N Y 2d 226, supra, with People v. Robinson, 13 N Y 2d 296, supra; Miranda v. Arizona, 384 U. S. 436; see, also, People v. Di Biasi, 7 N Y 2d 544; People v. Waterman, 9 N Y 2d 561).
Although, on the present record it appears highly unlikely that tirigg was in fact a police informant, the court should have granted the Huntley hearing requested by the defense in order to permit it to develop the facts. When a defendant raises at trial the voluntariness of an admission made to a private person who, it is also claimed, was acting as a police agent, the court should conduct a hearing at that time. (See People v. Hooper, 22 N Y 2d 655; People v. Ross, 21 N Y 2d 258, 262-263, supra.)
Accordingly, Mirenda should be accorded a hearing to determine whether tirigg was a police agent.
II. ffffffffOT Off SffVffÉAMOti Off OMff LffffffMDAMT’S ffffOSffOtlTIOM titmiMti TftlAL
The defendants claim that the Trial Judge committed reversible error when he denied a motion for a mistrial after Lítierardino pled gMlty to a lesser offense, and Ms prosecution was severed during the trial. The severance occurred approximately two weeks after the trial had begun.
*450 An automatic mistrial is not required simply because one defendant changes his plea in the middle of trial. However, one should be ordered if it is determined that the prosecutor actively sought the changeover, planned its occurrence for a tactical advantage, and the Trial Judge fails to give a precautionary warning to the jury.
The District Attorney made the motion to sever the prosecution against DiBerardino before the jury assembled in the courtroom. The Judge granted the motion, and defense counsel immediately requested a mistrial. The Judge denied the request without a hearing. DiBerardino then left the courtroom and only returned to testify.
When the jury entered the courtroom, but before the jury roll was called, the following colloquy took place:
‘1 The Court: Madam Forelady and Ladies and G-entlemen of the jury, before the roll is called, I want to say that everybody was here prior to nine-thirty. But there were some questions of law that were discussed, and a motion was made by Mr. Boseman on behalf of the defendant DiBerardino, that the trial be severed insofar as DiBerardino is concerned, that I granted that motion and that Mr. DiBerardino now is no longer a defendant in this case. The action has been severed with respect to him.
‘ ‘ Mr. Schneider: If it please the Court I would request at this time that your Honor instruct the jury that there are to be no inferences drawn either way as respects to the two remaining defendants because of this action.
‘ ‘ The Court: Yes, I will instruct the jury that they are to draw no inferences of any kind from the fact that this motion has been granted, and that Mr. DiBerardino is no longer a defendant in this case. Do not speculate on what the reasons were. You are not permitted to. And do not draw any inferences particularly any inferences unfavorable to the remaining defendants.”
This admonition by the court was sufficient to purge any prejudice from the shift. Whether the plea of DiBerardino was accepted before or during trial, this fact could hardly have been kept from the jury. In view of the fact that DiBerardino testified for the prosecution it was obvious that his transition would be attacked on cross-examination to impeach his credibility. Defense counsel in these circumstances would naturally try to elicit from the witness that some favor had been bestowed or *451 bargain struck with the prosecution in order to make the witness’ testimony suspect. Thus it appears that DiBerardino’s change in position would have been brought out in any case. Therefore, the severance of his prosecution during trial, in the absence of the jury, was not ground for ordering a mistrial. (See Commonwealth v. Sousa, 350 Mass. 591; Commonwealth v. Giacomazza, 311 Mass. 456.)
III. REHABILITATION OF A WITNESS BY HIS OWN TESTIMONY AFTER A CLAIM OF RECENT FABRICATION
The defendants contend that the court committed error when it permitted the witness DiBerardino to rehabilitate himself by testifying to prior consistent statements following a claim of recent fabrication.
On cross-examination DiBerardino testified that he had told the other defendants and their counsel, during a conference in jail, that it was Grigg and Heller, not Mirenda and Bielawa, who were the actual perpetrators of the crime. On redirect the District Attorney elicited from DiBerardino that on the evening he was arrested he told two police officers and an Assistant District Attorney that Mirenda and Bielawa were the two involved. The prosecution did not call any of the three police officers to whom' DiBerardino allegedly made these statements. These officers had testified at DiBerardino’s Huntley hearing.
Normally a witness is rehabilitated by either offering a document or by third-party testimony. Occasionally the witness himself testifies to something contained in a written instrument present in court or to which a third party later testifies. (People v. Baker, 23 N Y 2d 307; People v. Singer, 300 N. Y. 120, 123; Crawford v. Nilan, 289 N. Y. 444, 449; Moore v. Leventhal, 303 N. Y. 534, 537; Ferris v. Sterling, 214 N. Y. 249, 254 [1915]; People v. Feld, 305 N. Y. 322; People v. Katz, 209 N. Y. 311, 337; Matter of Hesdra, 119 N. Y. 615.) However, as Wigmore states the rule, ‘1 when * * * the statements are admissible at all, there is no reason why the impeached ivitness himself may not testify to them; even though this will usually be of less value than the testimony of other persons ” (4 Wigmore, Evidence [3d ed., 1940], § 1132, pp. 216-217).
*452 We see no reason why a witness cannot attempt to rehabilitate himself by testifying to prior consistent statements after a claim of recent fabrication. It is open to the adversary, of course, to point out to the jury that this rehabilitation testimony is a less reliable indication of veracity than if independent verification of the prior statements had been offered, and, therefore, the witness’ testimony should be viewed circumspectly.
IV. ADMISSION INTO EVIDENCE OF A PAIR OF SUNGLASSES
Defendants contend that sunglasses introduced into evidence were not sufficiently identified as having been dropped by one of them and that, therefore, their admission into evidence was erroneous.
The glasses were marked for identification during the direct examination of Detective Gill, who testified that the glasses were handed to him by a Mr. Kautz who had found them in the roadway near the trailer. The prosecution later called a Mrs. Lore who had been sitting in front of her home at the time of the crime. From this vantage point she overlooked the trailer site and the roadway. She testified that two men were momentarily halted in their flight from the direction of the trailer, when a car came to a sudden stop to avoid hitting them. The purpose of her testimony was to lay a foundation for claiming that the glasses found in the roadway were dropped by one of the fleeing suspects.
Charles W. Kautz, a salesman, testified that he had found the glasses on the roadway near the construction trailer. He stated that they appeared to be a good pair of glasses so he picked them up. Kautz did not see any of the three defendants drop them. Over objection that no connection with the defendants had been shown, the glasses were admitted subject to connection.
The prosecution sufficiently made the connection through the testimony of a truck driver’s assistant who had observed the defendants fleeing from the crime and DiBerardino’s testimony. The driver’s assistant testified that the glasses found by Mr. Kautz were similar to those he had noticed one of the suspects wearing. DiBerardino testified that the glasses found by Kautz resembled ones he owned and which he kept in his car. He stated that on one occasion, while Mirenda was a passenger in his car, he had offered the pair of glasses to him. However, *453 DiBerardino was not sure whether Mirenda had actually taken them or how soon after he had offered them to Mirenda he discovered they were missing. The prosecutor claimed during DiBerardino’s direct examination that the sunglasses were connected. Over objection to the admission- of the glasses, the court ruled: “ I will receive them for the purpose for which they were offered, merely as a pair of sunglasses which resemble sunglasses testified to by several witnesses.”
The admission of these glasses into evidence was not error. (See People v. Del Vermo, 192 N. Y. 470; People v. Kinney, 202 N. Y. 389, 396; see, also, People v. Hetenyi, 304 N. Y. 80, 86.) However, the trial court was mistaken in. characterizing them merely as examples of sunglasses, but this in no way was prejudicial to defendants. In this case there was no need to offer a model because the particular object being discussed— to wit sunglasses — is not so difficult to visualize that a model is required to assist the jury in understanding the witness’ testimony. (See People v. Feld, 305 N. Y. 322, 331-332, supra.)
The admissibility of these glasses into evidence was dependent solely on whether they were sufficiently connected with the defendants to be relevant to an issue in the case. The test for admissibility of this type of object is an evaluation of how close is the connection between the object and the defendant. If it is not so tenuous as to be improbable, it is admissible as is any other evidence which is relevant to an issue in the prosecution. The admission of this item into evidence is not dependent — as is a conviction based solely on circumstantial evidence •— upon a showing that the evidence adduced permits only one inference. (People v. Wachowicz, 22 N Y 2d 369; People v. Cleague, 22 N Y 2d 363.) Though the glasses were of a common variety the possibility that they were dropped in the roadway by someone other than the defendants was not so great as to make their introduction irrelevant. What the prosecution was attempting to prove was that these common glasses, which were found at the scene of the crime, were in fact the glasses DiBerardino offered Mirenda.
The process of drawing a concrete conclusion from differing inferences requires adding together a number of circumstances, each of which by itself might be common to many pairs of glasses but which, when viewed together, make it more than probable *454 that they could only co-exist in one pair of glasses. In this case there were enough surrounding circumstances to permit the jury to infer that these glasses were actually the glasses which DiBerardino offered Mirenda. (See, also, People v. Morhouse, 21 N Y 2d 66, 74, supra.)
The sunglasses were sufficiently connected to be properly admitted.
V. TESTIMONY BY A POLICE OFFICER OF STATEMENTS MADE TO HIM BY TWO ACCOMPLICES AT THE TIME OF THEIR ARREST
The defendants claim that statements made by Heller and Grigg two months after the attempted robbery were improperly admitted as statements made during the conspiracy.
The People called as a witness Detective Sergeant Murray of the New Rochelle Police Department. Sergeant Murray was one of a number of police officers who, on November 7,1964, two months after the crime, arrested Heller in a hotel in Manhattan. Heller and Grigg were taken to a police station where Murray interrogated them.
The District Attorney on direct examination elicited statements that Heller and Grigg had made to Murray. Timely objection was made to this line of questioning by defense counsel. However, the Judge permitted Sergeant Murray to testify, subject to the statements being connected as part of the conspiracy. The admission into evidence of these statements without limiting instruction as to all defendants was error even though Heller and Grigg testified because at the time these statements were elicited the conspiracy had terminated.
The District Attorney admits the error, but claims it was harmless since it was only cumulative of the direct testimony given by Heller and Grigg.
Permitting Sergeant Murray to testify, though his testimony was only cumulative, is not unlike the facts in People v. Colascione (22 N Y 2d 65, 72). In Colascione, a special agent of the Internal Revenue Service testified to conversations he had with an accomplice who also testified at trial. The People there, as in this case, urged that the evidence, if erroneously admitted, was not harmful because the special agent’s testimony was substantially the same as that earlier testified to by the accomplice. *455 We held the agent’s testimony improper because “ it sought to add the prestige of a government officer to accomplice testimony and to the prosecution’s theory of the case on a vital matter ” (id., p. 72).
In order to appreciate the full prejudice to the defendants with respect to Sergeant Murray’s testimony it must be pointed out that Grigg and Heller had already testified extensively to Mirenda’s and Bielawa’s participation in the crime. The prosecutor’s case had already unfolded. The jury was familiar with the cast of characters. The setting and the plot had been comprehensively discussed. In light of the prior testimony Murray’s appearance was very damaging to the defendants. His testimony extensively, once again, detailed the events surrounding the crime in chronological order in a simple narrative. Murray was requested to restate the story twice, in effect, since he testified to conversations with both Grigg and Heller. This testimony not only reinforced the accomplices’ testimony, but in addition served as an additional summation for the District Attorney. The fact that this testimony was merely cumulative of the accomplices’ own testimony does not render it harmless.
The District Attorney endeavors to distinguish this case from Colas done by noting that the jury would not be as impressed by a sergeant of police as they were in Colas done by a special agent for the Internal Revenue Service. We believe the distinction valiantly attempted to be drawn is unsound. The statements repeated by Murray bolstered the People’s case as in Colascione on a vital matter. Therefore, the admission of this testimony was error.
VI. SIXTH AMENDMENT RIGHT OF CONFRONTATION
Defendant Bielawa alleges his right of confrontation as guaranteed by the Sixth Amendment was violated when Grigg was permitted to testify to hearsay statements made to him by Mirenda which implicated Bielawa in the crime. Mirenda did not testify. The court instructed the jury to consider these statements only as to Mirenda. Even with this admonition Bielawa’s Sixth Amendment rights were violated (Bruton v. United States, 391 U. S. 123; People v. Baker, 23 N Y 2d 307, supra; Bruton has been held to be retroactive in Roberts v. Russell, 392 U. S. 293).
*456 On Grigg’s direct examination he was permitted to testify that on one occasion in the county jail he stopped over to see Mirenda and asked what really happened. Grigg’s testimony is: “He said that Joey [Bielawa 1 had accidentally pulled”, at which point he was interrupted by an objection. The witness was then permitted to finish his answer. 1 ‘ I had asked him what had happened. And he said Joey had — that the gun had gone off accidentally and he believed it was a hair trigger, and it was an accident as it went off ’ ’. Though the statements implicating Bielawa were not extensive, the District Attorney commented on them in his summation to the detriment of Bielawa. He referred to ‘ ‘ the testimony coming from the mouths of the killers themselves, through Rudy and through Grigg, the gun went off accidentally. That is why this man was shot dead before they could even say, ‘ Stick em-up. Hand over your money.’ Do you recall that? ” (See People v. Adams, 21 N Y 2d 397, 401-402.) The District Attorney admits that error was committed under Bruton but claims it was harmless error within the meaning of Chapman v. California (386 U. S. 18).
The rule set forth in Chapman is that a court, reviewing a Federal constitutional error, must be able to conclude that the error was “ harmless beyond a reasonable doubt ” (id., p. 24). Since Bielawa did not testify or make aUy admissions or confessions his own statements could not corroborate Mirenda’s admission which implicated him. The evidence adduced at trial when reviewed in this context indicates that “ 1 there is a reasonable possibility that the evidence complained of might have contributed to the conviction ’ ” (Chapman v. California, supra, p. 23). However, we do not decide this specific issue because the failure to confront one’s accuser, at least when viewed with the other errors which occurred at trial, is substantial enough to require a reversal.
VII. COMMENTS OF THE BROSECÜTOR DURING SUMMATION
The defendants claim that the District Attorney in his summation overstepped the proper bounds of comment.
The prosecutor’s summation hns to be viewed separately as to each defendant. The District Attorney alluded to the fact that neither of the defendants took the stand and that no alibi wit *457 nesses were produced by tbe defendants. Defendant Mirenda attempted to influence tbe jury by asserting be would call alibi witnesses wbo would testify that be was not at tbe scene of tbe crime. Defense counsel introduced an exhibit which contained tbe names of witnesses Mirenda intended to call. Mirenda, however, never called any witnesses. Tbe court placed no limits on tbe prosecutor’s right to comment on tbe absence of alibi witnesses. And tbe prosecutor persisted in using the word defendants rather than particularizing as to Mirenda during bis summation.
Tbe District Attorney made repeated references to tbe defendants’ failure to produce witnesses. Tbe court consistently sustained objections to these statements. Tbe Judge each time instructed tbe jury that tbe defendants were not required to call witnesses. However, the prosecutor persisted and stated that tbe defendants failed to produce “ a single solitary witness ”. “ I think it is fair comment to comment on tbe fact that there wasn’t a single solitary bit of evidence produced by tbe defendants.” (f You were here. You determine what tbe facts are. Was there any evidence outside of what the People produced? ” <( Suspicion, specious argument, not a dribble of evidence on behalf of tbe defense.”
In respect to Bielawa these comments were error. While it is not clear that tbe comments of tbe District Attorney were justified even as to defendant Mirenda, when viewed with respect to Bielawa, tbe comments were certainly prejudicial. (See People v. Christman, 23 N Y 2d 429).
After tbe Judge bad admonished the jury that tbe defendants were not required to call witnesses tbe prosecutor made direct • reference to tbe failure of the defendants to take tbe stand. These comments were in violation of the long-established Hew York law and recent Supreme Court opinions (People v. McLucas, 15 N Y 2d 167; People v. Leavitt, 301 N. Y. 113, 118; People v. Bianculli, 9 N Y 2d 468, 472; People v. Travato, 309 N. Y. 382, 386; People v. Abel, 298 N. Y. 333, 335; People v. Robinson, 13 N Y 2d 296, 301; Griffin v. California, 380 U. S. 609; Chapman v. California, 386 U. S. 18, supra).
Tbe District Attorney remarked,(< I have three out of the five conspirators willing to testify ”. He later said, “ We gave you two out of tbe five conspirators * * * and then * * * *458 we obtained a third These comments were undeniably error and were prejudicial.
Accordingly, the judgments of conviction should be reversed and a new trial ordered for both defendants.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Breitel and Jasen concur.
Judgments reversed and a new trial ordered.